1   UNITED STATES DISTRICT COURT

2   NORTHERN DISTRICT OF NEW YORK

3   - - - - - - - - - - - - - - - - - - - -

4   UNITED STATES OF AMERICA,

5       -versus-                   09-CR-75

6   JOHN PUGLISI.

7   - - - - - - - - - - - - - - - - - - - -

8         TRANSCRIPT OF PROCEEDINGS held in and for

9   the United States District Court, 15 Henry Street, Binghamton,

10   New York, on TUESDAY, July 21, 2009, before the

11   HONORABLE THOMAS J. McAVOY, SENIOR UNITED STATES DISTRICT

12   COURT JUDGE, Presiding.

13

14   WITNESS:  Susan Schwenk

15

16   APPEARANCES:

17   FOR THE GOVERNMENT:

18   UNITED STATES ATTORNEY'S OFFICE

19   BY:  MIROSLAV LOVRIC, AUSA

20       Binghamton, New York

21

22   FOR THE DEFENDANT:

23   VINCENT ACCARDI, ESQ.

24   Binghamton, New York

25

1          MR. LOVRIC:  Judge, the next witness is Susan

2    Schwenk.

3          THE COURT:  Okay.

4          THE CLERK:  Mrs. Schwenk, please come forward

5    to be sworn.  Would you state your full name for the record,

6    please.

7          THE CLERK:  Susan Belinda Schwenk.

8    S U S A N   S C H W E N K, having been called as a witness,

9    being duly sworn, testified as follows:

10         THE COURT:  Okay, Mr. Lovric.

11   DIRECT EXAMINATION

12   BY MR. LOVRIC:

13        Q    Good afternoon, Miss Schwenk.

14        A    Good afternoon.

15        Q    I'm going to ask you to try to pull that microphone

16   a little closer just to make sure that everybody can hear

17   you.  Okay?

18        A    Yes.

19        Q    Miss Schwenk, I'd like to talk with you this

20   afternoon about a person named Hillary Pratt.  Who is Hillary

21   Pratt?

22        A    She's my daughter.

23        Q    And at some point with respect to your daughter,

24   did you at some point become alerted to some things that may

25   have occurred at her high school?

1      A      Well --

2      Q      I just want to get --

3             MR. ACCARDI:  Objection to the

4    characterization of happening at her high school.  I don't

5    know if there's evidence of that.

6             THE COURT:  Okay.  Want to rephrase it.

7             MR. LOVRIC:  Sure.

8      Q      I'm getting tongue tied.  I'm sorry, Miss Schwenk.

9    Where does Hillary go to school?

10     A      Newark Valley High School.

11     Q      Has she always gone to that high school?

12     A      Yes, she has.

13     Q      Okay.  And currently how old is Hillary?

14     A      She turned 17 in March.

15     Q      Okay.  This past school year, and by that I mean

16   the school year that started somewhere in September of 2008

17   and went until just recently in June of '09.  When she

18   started school in September of '08 how old was she?

19     A      Sixteen.

20     Q      And from the time that she started in September of

21   '08 up through the entire month of January of '09 she was how

22   old?

23     A      She was 16.

24     Q      Now, I don't mean to pry, I just want to have

25   somewhat of a -- simply for you to identify -- Hillary has

1  the last name of Pratt.  Your current last name is Schwenk,

2  is that correct?

3       A    Correct.  I remarried.

4       Q    And your current husband's name?

5       A    Is Greg Schwenk.

6       Q    Okay.  And then I take it Hillary is your daughter

7  from a previous marriage?

8       A    That is correct.

9       Q    The time frame I'd like to discuss and talk a

10  little bit about, September/October of '08, that time frame

11  and up through and into January and specifically up until

12  January 7 of 2009.  During this time frame, September '08 to

13  January 7, '09, did Hillary have a cellphone?

14       A    Yes, she did.

15       Q    And how did she obtain or get that cellphone that

16  she had at that time?

17       A    I put her on my plan with me.

18       Q    Okay.  And your plan was through which provider,

19  which service provider?

20       A    AT&T.

21       Q    Okay.  And in connection with that cellphone, was

22  that a cellphone that she exclusively used or did you both

23  use it, how did that work?

24       A    She used it.  It was her phone.

25       Q    Okay.  And on that phone and that plan through

1    AT&T, do you know what kind of service you had as far as

2    texting and things of that sort?

3         A    I changed it at one point but I believe at that

4    time she had unlimited texting.

5         Q    Okay.  Now, in connection with the matter that we

6    are here to talk about today, did there come a point in time

7    when you actually provided certain records, telephone records

8    to the New York State Police?

9         A    I did.  It was after January 7.  It was after

10   January 23.

11        Q    Okay.  And were these records records of that AT&T

12   phone that Hillary had?

13        A    Correct.  Yes.

14        Q    Okay.  Now, I'm going to show you Exhibit 4, that's

15   marked Exhibit 4.  And what I'd like you to do is just

16   look -- look at that telephone number in those records,

17   Exhibit 4.  Do you see that?

18        A    Yes.

19        Q    Do you recognize that phone number?

20        A    Yes.  That was Hillary's phone number.

21        Q    Okay.  And the phone that Hillary used, was that

22   phone on your account in your name?

23        A    Yes, it was.

24        Q    Okay.  And at some point you had provided some

25   records, AT&T records to the New York State Police?

1    A    Yes.  That's correct.

2    Q    Miss Schwenk, how would you describe your

3 relationship with Hillary in September, October, November of

4 2008, that time frame?

5    A    It was -- I had constant contact with Hillary all

6 the time and I always talked to Hillary.  She's a teenager so

7 she's not -- she's not readily going to tell me her daily

8 event every single minute but she and I were pretty close in

9 the sense that I knew usually what was going on with her or I

10 thought I did.  And she would talk to me about things.

11    Q    Okay.  Now, the time period we're talking about,

12 did you know a person named Kelsey or Kels?

13    A    Kelsey is a friend of Hillary's at that time.

14 She's a very close friend of Hillary's.  They were pretty

15 much inseparable for a good chunk of a year or two.

16    Q    Okay.  The time period around the Christmas

17 holidays of 2008, during that time period when -- let me ask

18 you first:  Was Hillary on break at some point in December of

19 2008?

20    A    She was on her holiday break from school and at

21 that time actually my sons were in town from college visiting

22 also.  So everyone was -- everyone was off.

23    Q    Okay.  Did you recollect that holiday break, was

24 there a time being a day here, day there where Hillary was

25 staying or had indicated she was staying with some friend at

1    a friend's house?

2         A    Yes.  There was a few days in a row where she had

3    told me she was staying with Kelsey.  She would call me every

4    day and talk about whatever they did and that was not unusual

5    because she was always with Kelsey and during that time frame

6    actually -- back up.  My boys didn't come in until the day

7    after Christmas I believe.  We kind of go back and forth

8    every year even though they're older.  We still go by what

9    the courts said way back when, so we still alternate

10   holidays.  And our Christmas didn't begin until after

11   Christmas so I didn't mind that Hillary was gone and out with

12   Kelsey's family because they were having holiday parties and

13   such.  This is what I was told.

14        Q    I take it at that point, at that time you believed

15   that that's where she was?

16        A    That's correct.

17        Q    Now up until January 7 of 2009, did Hillary have

18   that phone that you just described?  Did she have that as her

19   cellphone?

20        A    Yes, she did.

21        Q    On January 7, 2009, did something happen at your

22   house between you and Hillary?

23        A    Yes.  She woke up -- actually that was the day of

24   the ice storm beginning and everywhere else.  My husband was

25   home from work.  I generally work from home and I was home

that day and Hillary had woken up and immediately wanted to
leave.  And I fought with her about it because of the weather
for obvious reasons.  And she insisted, and I don't remember
the girlfriend's name that she referred to, but it was a
friend of hers and Kelsey's, more Kelsey's that she was going
to go with.  She had said that her mother -- her mother said
it was okay, she was going to pick Hillary up.  I fought with
her about it verbally because I didn't want her to go and she
finally -- it just escalated and I was trying to work and I
had to get on a conference call and I just said fine, go.
And she went out the door.

    Q    Okay.  Did you see who it was that picked her up,
if anyone?

    A    I was angry, I didn't even look but from my office
at home, to look out I really can't see.  The car, I don't
believe ever came into the driveway I think because of the
ice.  I don't think anybody could have gotten up our
driveway, so I think she met that person on the road.

    Q    Okay.  Now, at some point after Hillary left the
house, did you at some point take any actions to try to
determine where she might have gone?

    A    Yes.  It took me about five minutes and I -- I
called up Kelsey's mother Kim and she and I generally would
try to keep tabs on the girls together as a unit.  And I
called her and asked her if this friend, who I apologize I

1    don't remember her first name, but if her mother would allow

2    her to drive on a day like today.  And Kim said absolutely

3    not and from there I learned that Hillary had not been at

4    Kelsey's for weeks.  And we talked a little longer and I got

5    off the phone with her and I called our family friend Zach

6    who does not have dial up.  I have dial up in my home and he

7    has high speed and I asked him to go on to my AT&T account

8    and find out who the last person was that Hillary had texted

9    or called.

10        Q    And did you at some point determine who the last

11   person was she communicated with?

12        A    The number came up as John Puglisi.

13        Q    Did this friend of yours make -- you mentioned

14   Zach.  Did he actually on your behalf call that number a

15   couple of times?

16        A    I don't know if it was once or twice he called.  He

17   apparently got Hillary on the phone.

18             MR. ACCARDI:  Objection, your Honor, as to

19   whether or not she would have firsthand knowledge as to

20   something that was told to her.

21             MR. LOVRIC:  I can move on, Judge.

22             THE COURT:  Okay.  Go ahead.

23        Q    Miss Schwenk, without telling us the nature of the

24   conversation, did you at some point after speaking to your

25   friend Zach, did you at some point then see Hillary soon

1  after that?

2      A    Within 20 minutes she was back home.

3      Q    And did you and she then have a discussion?

4      A    We did.

5      Q    At that point in time did you discuss with Hillary

6  where she was?

7      A    I did.  Do you want me to elaborate?

8      Q    Well at some point -- I don't want to get too much

9  in the conversation at this point -- but at some point was a

10 person by the name of Seth discussed between you and Hillary?

11     A    Yes.

12     Q    Okay.  And after that conversation with Hillary

13 when she comes back about 20 minutes after you called your

14 friend Zach, did you at some point the following day get any

15 kind of a communication from Mr. John Puglisi?

16     A    I did.

17     Q    What was it that you got from him?

18     A    It was in the form of a letter from -- an e-mail

19 from his workplace to my workplace.

20     Q    Okay.  I'm going to show you what's been marked as

21 Government Exhibit number 11, Miss Schwenk, take a look at

22 Exhibit 11 and tell me if you recognize that?

23     A    I do.

24     Q    What is that Exhibit 11?

25     A    It's the letter that Mr. Puglisi had written to me.

1   It's more or less an apology letter explaining his

2   involvement with the whole Seth thing.

3        Q    And you can, if you need to refer to the letter,

4   what was it generally that Mr. Puglisi was saying to you in

5   that communication as far as what happened with Hillary and

6   this person Seth?

7        A    Basically he stated that this person was someone

8   that I -- I guess I took it as he mentored.  He was a son of

9   an extramarital relationship and he had kind of watched over

10  him and allowed him to use his cellphone.

11       Q    Mr. Puglisi's cellphone?

12       A    Correct.  And that's why the name came up as John

13  Puglisi.

14       Q    At that point when you received this e-mail from

15  Mr. Puglisi, what was your understanding as far as these

16  communications between Hillary's cellphone and John Puglisi's

17  cellphone?

18       A    I'm not sure I understand your question.

19       Q    Okay.  After you received this e-mail from

20  Mr. Puglisi, what did you believe was going on with respect

21  to the cellphones communicating, that being Hillary's and

22  Mr. John Puglisi's?

23       A    I believe that Seth was using the phone.

24       Q    Okay.  And I take it that -- did you get any kind

25  of impression what age group Seth was?

1    A    Hillary told me that Seth was 18 or 19 but he was

2  older and that that's where she had been all the nights that

3  I thought she was with Kelsey.

4    Q    Okay.  And on January 8, 2009 when you received

5  that e-mail, were you pretty much satisfied that that was the

6  end of this story and what had occurred between Hillary and

7  Seth?

8    A    After I brought it home and I really discussed it

9  with my husband, yeah, I was.  I just -- I had no reason not

10  to think anything other than that.

11                MR. LOVRIC:  Okay.  With respect to

12  Government's Exhibit 11, your Honor, I would offer that into

13  evidence, that being the e-mail that Miss Schwenk received.

14                MR. ACCARDI:  No objection.

15                THE COURT:  Receive Government's 11 in

16  evidence.

17                MR. LOVRIC:  Your Honor, if we can have a

18  quick side-bar just in connection with Government Exhibit 4.

19                THE COURT:  Okay.

20                MR. LOVRIC:  I want to indicate to the Court

21  what it is.

22                (At the Bench)

23                MR. LOVRIC:  I'm sorry, Judge.  I should have

24  brought this up.  Government Exhibit 4 are AT&T records.

25  They were obtained from AT&T by the New York State Police.  I

1  had discussed with Mr. Accardi whether or not I'd have to

2  bring an AT&T custodian in to put them in.  He generously

3  indicated that wouldn't be necessary, so I will be offering

4  this.  Obviously they're not the records she provided but

5  they're records provided by AT&T.  I can do a stipulation

6  that the Court could read if a custodian would have come he

7  would say these are the records.  You know, the parties agree

8  these records are AT&T bills, records.

9            THE COURT:  Is that all right with you?

10            MR. ACCARDI:  Yeah.  We talked about it

11  previously.

12            THE COURT:  Okay.  That will work.

13            MR. LOVRIC:  I'll just offer them at this

14  point.

15            THE COURT:  We'll do the stip later.

16            (In open Court).

17            MR. LOVRIC:  Judge, I believe I moved Exhibit

18  11 into evidence.

19            THE COURT:  Court received 11.

20            MR. LOVRIC:  I'll also move Government Exhibit

21  4 into evidence, that being AT&T telephone records.

22            THE COURT:  All right.  As I understand it

23  there's a stipulation or agreement between counsel that those

24  records can come in and the Court will receive them pursuant

25  to stipulation.

BY MR. LOVRIC:

Q    Miss Schwenk, just before I forget.  The Exhibit 4, the stack of records that you have in front of you, the AT&T records, can you just read the phone number that those records relate to?

A    (607)239-3079.

Q    And again that phone number was whose telephone in your family?

A    My daughter Hillary.

Q    Okay.  Now, after January 7 and then after January 8, the things that you've just described for us regarding that e-mail, when was the next time that you learned or heard of anything relating to Mr. John Puglisi?

A    It was January 23.  I was at work and I received a call from Investigator Sue Mulvey who proceeded to explain to me what was going on.

Q    Okay.  And between that time frame did you have any other indicators of whether or not there was anything of any sorts occurring between Hillary and Mr. John Puglisi?

A    Absolutely not.

Q    Okay.

MR. LOVRIC:  Those are all the questions I have, your Honor.

THE COURT:  Okay.  Mr. Accardi.  Cross-examine.

1    CROSS-EXAMINATION

2    BY MR. ACCARDI:

3         Q    Miss Schwenk, where are you employed?

4         A    Excellus Blue Cross and Blue Shield.

5         Q    Where is your office physically located?

6         A    I'm sorry?

7         Q    Where is your office physically located?

8         A    The office is in Dewitt, up near Syracuse.

9         Q    How often do you have to be up there?

10        A    Probably twice a week.

11        Q    And the rest of the time you stay at home?

12        A    Usually, yes, I'm at home, yes.

13        Q    And are there times where you stay up there over

14   night?

15        A    I have to, yeah.

16        Q    How often is that?

17        A    It was more so over the wintertime when the roads

18   are bad but I don't do it so much now but back then it was --

19   sometimes once a week, twice a week.

20        Q    So in December and January, were those times when

21   you'd be staying overnight?

22        A    I may have, yeah.

23        Q    And the bulk of time you would have been home?

24        A    Yes.  If I wasn't at work, yes.

25        Q    When you were staying overnight up in Dewitt, who

1 would have been home?

2     A     My husband.

3     Q     And Hillary?

4     A     And Hillary.

5     Q     And Hillary.  So on those nights did you check and

6 talk to Hillary at your house?

7     A     A lot of time, yeah, we would talk at the house or

8 she would call me on her cellphone, up until the point I took

9 the cellphone away.

10     Q     That was not until sometime in January?

11     A     That was January 7, yeah.

12     Q     Now, you indicated you had a couple of sons that

13 were home at that point during Christmas?

14     A     They were home during Christmas.  I want to say --

15 I'm not positive of the time frame because it changes so

16 much -- but I want to say the day after Christmas and were

17 here through their break which is like the second week in

18 January.

19     Q     They're both away in school?

20     A     Yep.

21     Q     Is one of them out of state?

22     A     They are both out of state in Georgia.

23     Q     Did one of them come home with their girlfriend?

24     A     Yes.  My 21 year old.

25     Q     Do you recall him coming home earlier than

1    Christmas?

2        A    I don't think so.  I think this year was the year

3    that they came a little later.  I'm not positive.

4        Q    In any event, Hillary was not home Christmas Eve

5    night?

6        A    No.  And the reason I'm thinking they weren't here

7    yet because our Christmas, we're not really religious, our

8    Christmas began when they're here.

9        Q    If it turned out they were home earlier, Hillary

10   was not home Christmas Eve, was she?

11       A    I don't believe so.

12       Q    And did you call her Christmas Eve at all?

13       A    I don't -- she usually called me so it's so long

14   ago I don't remember.

15       Q    And you also indicated that she was inseparable

16   from Kelsey?

17       A    M-m h-m-m.

18       Q    And how did you phrase it, you and Kelsey's mom

19   would try and keep tabs on the girls?

20       A    Yeah.  You know, prior to that we had been kind of

21   just watching out for each other.

22       Q    How long had you been watching out for each other?

23       A    Like ever since we knew that they were hanging out

24   together.

25       Q    So weeks go by, according to you at least as I

1    heard your testimony, where Hillary tells you she's with

2    Kelsey and you are not checking up at that point even though

3    you were doing it on a regular basis for years?

4         A    No, it wasn't weeks.  It was the couple weeks

5    during holiday break and I'd had no reason to think anything

6    bad was happening because she was with Kelsey.

7         Q    What about in December, were there other parts in

8    December when she wasn't home?

9         A    Maybe earlier in the month but it wasn't unusual is

10   what I'm saying.  It was never unusual for her to be gone for

11   couple days staying at Kelsey's, where she actually was at

12   Kelsey's.

13        Q    It was unusual then for you not to have been in

14   touch with Kelsey's mom to make sure?

15        A    Yeah, yeah.  It was only when I suspected something

16   or she did something.

17        Q    Let me see if I got this straight then.  If you

18   suspect something you would checkup on them; if not, you

19   wouldn't checkup?

20        A    Not with Kim, no.

21        Q    So Christmas Eve, as far as you were concerned, she

22   was with Kelsey's family doing Christmas things?

23        A    Correct.  I didn't find out until the 7th when I

24   talked to Kim that she wasn't where she said she was.  That's

25   why I took the phone away.  I determined at that point from

1  then on she would call me from a landline.  I would know

2  where she was.

3        Q     How would that be?

4        A     I just felt I would have a better handle on it if

5  she was calling me from Kelsey's or whoever she was at.  She

6  could call me anywhere from a cellphone and tell me somewhere

7  else.

8        Q     Between January 7 and January 23 nothing happened

9  then that made you feel that?

10       A     No.

11       Q     Anything amiss?

12       A     No.

13       Q     The day of the ice storm, you said that you were

14  involved in work?

15       A     Yeah.  I was supposed to have a conference call I

16  believe and she had woken up -- like she woke up with an

17  attitude to like start something with me because she just

18  really wanted to go with John, and I didn't know that at the

19  time but that's what I'm getting now.

20       Q     You're just reaching that as a conclusion?

21       A     Yes.  In hindsight.

22       Q     In any event, you told her you did not want her to

23  go?

24       A     Correct.

25       Q     But then you finally told her just go?

1    A    Well, I was angry and she is very persistent and

2  she and I fought and fought verbally until I -- I had to get

3  back to work.  I just threw my hands up and said go.

4    Q    Is it a fair characterization that you threw her

5  out of the house that day?

6    A    She says -- I did not do that.  She told me I said

7  that to her.  I never said that to her.

8    Q    Her recollection of that incident is that you threw

9  her out of the house?

10   A    No.  I just told her go, go, get out.  Maybe I said

11  it.

12   Q    I thought she says you threw her out but you

13  didn't?

14   A    No, that's not correct.  She's come back to me and

15  said, mom, I remember you saying get out.  And I may have

16  said get out but not get out.  Just leave, you know.  I

17  wasn't throwing her physically out of the house permanently.

18  I was just telling her to go.  I didn't want to hear anymore.

19  I didn't want to argue anymore.  I had to work.

20   Q    Now somebody, a friend of a friend of Kelsey's was

21  supposed to be coming to pick her up then?

22   A    I keep hearing Sara in my head but I don't know the

23  girl's name and it was a friend of Kelsey's more than

24  Hillary's and they had been, from what Hillary had told me,

25  hanging out together and I just didn't think -- I didn't

1    think it was weird that she was going to be with this girl.

2    I was very upset that she would want to be with this girl the

3    day of an ice storm.  I had a problem with the weather, not

4    what she was doing.  I had a problem with her leaving the

5    house because of the weather.

6        Q    So you had a problem with her being out the day of

7    an ice storm but not being with Kelsey on Christmas Eve?

8        A    Correct.

9        Q    In any event, she went out of the house as opposed

10   to having somebody come to the house and get her?

11       A    Yeah.  You mean the ice storm day?

12       Q    Yeah.

13       A    Yes.  The ice in our driveway is horrid.

14   Anybody -- if we were welcoming them in they wouldn't be able

15   to get up our driveway I'm assuming because it was a sheet of

16   ice.  That was my argument was this is what we're looking at,

17   what are the roads going to be like.  I was very concerned

18   about it.

19       Q    But she was going anyways?

20       A    Yeah.  She was just pretty much going to go.  She

21   told me she was going to go no matter what I said, so

22   eventually I said okay, fine, go.

23       Q    But you would not characterize it as having thrown

24   her out?

25       A    I did not throw her out, no.  I just told her leave

1  then.

2      Q    And again preceding Christmas Eve and up until

3  January 7 you never verified anything with Kelsey's parents?

4      A    Not until the 7th.  I had no reason to believe

5  anything other than that, that she was with Kelsey.

6                  MR. ACCARDI:  If I can have just a moment?

7                  THE COURT:  Sure.

8                  MR. ACCARDI:  Thank you.

9                  THE COURT:  Okay.  Redirect?

10                 MR. LOVRIC:  Yes.

11  REDIRECT EXAMINATION

12  BY MR. LOVRIC:

13      Q    One question, Miss Schwenk.  After you took the

14  cellphone away from Hillary on January 7, did she to your

15  knowledge have any cellphone that you or your husband gave

16  her?

17      A    No.

18      Q    So, to your knowledge she had no other cellphone

19  that she would have gotten from any part of the family?

20      A    No.

21      Q    Okay.

22                 MR. LOVRIC:  That's all.

23                 THE COURT:  Mr. Accardi?

24                 MR. ACCARDI:  Nothing further, your Honor.

25                 THE COURT:  Thank you, Miss Schwenk.  You may

1    step down, ma'am.

2                    (Witness excused).

3

4                C E R T I F I C A T I O N

5

6

7            I, VICKY A. THELEMAN, RPR, CRR, United

8    States Court Reporter in and for the United States

9    District Court, Northern District of New York, do

10   hereby certify that I attended at the time and place

11   set forth in the heading hereof; that I did make a

12   stenographic record of the proceedings had in this

13   matter and cause the same to be transcribed; that

14   the foregoing is a true and correct copy of the same

15   and the whole thereof.

16

17

18                            _____

19                            VICKY A. THELEMAN, RPR, CRR

20                            United States Court Reporter

21                            US District Court - NDNY

22

23

24   Dated:  October 26, 2009.

25