```
 1 │ UNITED STATES DISTRICT COURT
 2 │ NORTHERN DISTRICT OF NEW YORK
 3 │ - - - - - - - - - - - - - - - - - - - -
 4 │ UNITED STATES OF AMERICA,
 5 │         -versus-                          09-CR-75
 6 │ JOHN PUGLISI.
 7 │ - - - - - - - - - - - - - - - - - - - -
 8 │           TRANSCRIPT OF PROCEEDINGS held in and for
 9 │ the United States District Court, 15 Henry Street, Binghamton,
10 │ New York, on TUESDAY, July 21, 2009, before the
11 │ HONORABLE THOMAS J. McAVOY, SENIOR UNITED STATES DISTRICT
12 │ COURT JUDGE, Presiding.
13 │
14 │ WITNESS:  Diane Arbes
15 │
16 │ APPEARANCES:
17 │ FOR THE GOVERNMENT:
18 │ UNITED STATES ATTORNEY'S OFFICE
19 │ BY:  MIROSLAV LOVRIC, AUSA
20 │       Binghamton, New York
21 │
22 │ FOR THE DEFENDANT:
23 │ VINCENT ACCARDI, ESQ.
24 │ Binghamton, New York
25 │
```

1                    (Short break taken).

2                    (Jury present).

3                    THE COURT:  Okay, Mr. Lovric.

4                    MR. LOVRIC:  Judge, the next witness is Diane

5    Arbes.

6                    THE COURT:  Okay.

7                    THE CLERK:  Please come forward to be sworn.

8    Would you state your name for the record, please.

9                    THE WITNESS:  Diane Arbes.  A-R-B-E-S.

10   D I A N E    A R B E S, having been called as a witness,

11   being duly sworn, testified as follows:

12                    THE COURT:  Okay, Mr. Lovric.

13   DIRECT EXAMINATION

14   BY MR. LOVRIC:

15       Q    Good afternoon, Miss Arbes.

16       A    Hello.

17       Q    Okay.  I think you're okay but just make sure you

18   speak into the microphone.

19       A    I will.

20       Q    Okay.  Miss Arbes, can you tell the members of the

21   jury where do you work and what kind of work do you do?

22       A    I work at the Newark Valley High School and I'm

23   principal at the high school.

24       Q    And approximately how long have you been principal

25   there?

1      A     I will be a principal there two years this week

2  actually.

3      Q     Okay.  Congratulations.

4      A     Thank you.

5      Q     Prior to your last two years at Newark Valley High

6  School, were you previous to that also in the educational

7  field at that school?

8      A     Yes.  Well, the first 22 years of my teaching

9  experience was at Newark Valley, after which I went to Broome

10 Tioga BOCES for seven years subsequently.

11     Q     Okay.  Just so we put some time frame, about what

12 year was it that you left after many years at Newark Valley

13 to go to BOCES?

14     A     It was about in the year 2000.

15     Q     And then you returned to Newark Valley High School

16 in what year?

17     A     2007.

18     Q     And when you returned to Newark Valley in 2007, I

19 take it you returned as the principal of that high school?

20     A     That's correct.

21     Q     Okay.  Now, when you returned to Newark Valley in

22 2007, did you at that time know or get to know a person named

23 John Puglisi?

24     A     Yes, he was one of my social studies teachers.

25     Q     And just for the record, do you see Mr. Puglisi in

1    court today?

2         A    Yes, I do.

3         Q    Can you just tell us who it is that you're talking

4    about?

5         A    That would be John Puglisi in the red shirt.

6              MR. LOVRIC:  Okay.  Just for the record

7    indicating the defendant, your Honor.

8              THE COURT:  Record will so reflect.

9         Q    Now, when you came back in 2007 Mr. Puglisi was a

10   teacher at Newark Valley?

11        A    That is correct.

12        Q    Okay.  Was he there when you left about

13   approximately 2000 to go to BOCES?

14        A    He was not at the time that I left.

15        Q    When you became principal in 2007, did you at that

16   time, in addition to getting to know him, did you learn about

17   how long he had been at Newark Valley?

18        A    Approximately, yes.

19        Q    Okay.  So approximately how many years was

20   Mr. Puglisi a teacher there?

21        A    About seven to eight years.

22        Q    Okay.  Seven to eight years total?

23        A    Seven to eight, yes, approximately.

24        Q    Okay.  So would that mean that he came some time

25   shortly after you left to go to BOCES during that

1    seven-or-eight year period?

2        A    I believe so.

3        Q    Okay.  Now, when you became principal in 2007, and

4    I'll talk about from 2007 up until and through January 23 of

5    2009, what kind of courses or classes was Mr. Puglisi

6    teaching?

7        A    Mr. Puglisi taught the global studies, global

8    history course.

9        Q    Okay.  And does that include students from all

10   different grades or what level does that instruction involve?

11       A    Ninth and tenth grade.

12       Q    Okay.  Did he teach any other additional courses

13   other than the global studies?

14       A    He did not.

15       Q    Okay.  I take it then he primarily taught ninth and

16   tenth graders in high school?

17       A    That is correct.

18       Q    Now, how would you describe Newark Valley High

19   School as far as the size of the high school, student body

20   and teaching staff, how would you describe that?

21       A    We have about 530 students in grades 8 through 12

22   which is housed at the high school.  About 112 in a

23   graduating class.  It is a small school system.  It is a

24   close-knit faculty.  It is, I think, our retention is quite

25   high.  Many folks who come to Newark Valley stay for many

1   years.

2          Q     Okay.  So, for example, per grade level your class,

3   let's say ninth grade class or tenth grade, it would be

4   approximately what kind of a number?

5          A     I would say between 90 and 112.

6          Q     And as an educator would you classify that as being

7   small, medium or large class?

8          A     I would say that's between a small and a medium

9   size school.  The lower part of the spectrum.

10         Q     Okay.  And Newark Valley High School, now that's

11  located where approximately?

12         A     Newark Valley is about seven to ten miles north of

13  Owego.  It is, I'll say, kind of a diagonal between

14  Binghamton and Ithaca.

15         Q     Okay.

16         A     It's on Route 38.

17         Q     Okay.  And what county is that in?

18         A     Tioga County.

19         Q     Okay.  And at the time that you came back and were

20  the principal from 2007 up until -- and through January of

21  2009, was Mr. Puglisi a full-time teacher at that school?

22         A     Yes, he was.

23         Q     Okay.  Do you know during that time frame whether

24  or not, in addition to teaching, did he have any other kind

25  of duties as a coach or anything like that nature, to your

1   knowledge?

2          A    I don't believe he was a coach at that time.  I

3   know that he was an advisor of sorts in support of a Yes

4   grant that we have through Catholic Charities.

5          Q    Now, with respect to the matter that you're being

6   called here today to talk about, I'd also like to briefly

7   talk about a person named Hillary Pratt.  Do you know Hillary

8   Pratt?

9          A    I know Hillary Pratt, yes.

10         Q    Okay.  And who is she, I guess, first thing?

11         A    Hillary is an eleventh grade student.  She chose to

12  be an early graduate so she'll be graduating this August.  Up

13  until this situation, I did not know Hillary.  Although we

14  are a small school, she was a student that had not crossed my

15  path for discipline reasons or classroom issues so I was not

16  familiar with this young lady.

17         Q    Okay.  I take it things haven't changed much since

18  we were in high school.  If the principal doesn't know you

19  that's good, right?

20         A    Well, I guess, sometimes.

21         Q    Okay.  When -- so Hillary Pratt was a student and

22  you said that she is going to graduate early?

23         A    Correct.

24         Q    Okay.  And just generally speaking how is that?  Is

25  that some kind of an accelerated program that she's doing?

1        A     Yes, it is.  She will be or she has been taking

2   some summer courses to complete her requirements.  I believe

3   it is participation in government and economics so that she

4   can -- and English I believe so that she can graduate early.

5        Q     Okay.  Just generally speaking is that very common

6   in your school for a high school student to do that or not?

7        A     It happens occasionally.  You might have and,

8   again, I have to speak from the past.  This is my first in

9   two years.  It might be one, maybe two students a year.  Last

10  year we didn't have any so I can only speak to this year.

11       Q     Okay.  Generally speaking, would you say she's a

12  good student?

13       A     I would, yes.

14       Q     Now, Miss Arbes, prior to and I'll focus here on a

15  specific date, prior to January 8 of 2009, prior to that date

16  did you really know anything about Hillary or did she come

17  across kind of your radar in any capacity?

18       A     She did not.

19       Q     On January 8 of 2009, was there some type of

20  information that came to your attention that caused you then

21  to act or take action?

22       A     There was.  A staff member came to me concerned

23  because she witnessed Mr. Puglisi dropping Hillary off at

24  school in the morning.  It was something that she was not

25  comfortable with and, therefore, felt that it needed to be

1    communicated to a principal.

2        Q    So then that information came to your attention?

3        A    That is correct.

4        Q    And is that the first time that anything regarding

5    Hillary Pratt and/or Mr. Puglisi came to your attention?

6        A    That is correct.

7        Q    And as a result of that, did you then schedule a

8    meeting with Mr. Puglisi?

9        A    I did.

10       Q    And when did that meeting occur?

11       A    That meeting occurred on Friday the 9th, towards

12   the end of the day, probably eighth or ninth period which

13   would be about 2:00.

14       Q    And who was present at that meeting?

15       A    Mr. Puglisi, myself and the union president, Jill

16   Keeler.

17       Q    And this union president or representative is that

18   something that's kind of common if you're going to have a

19   discussion with a teacher about --

20       A    Absolutely.  Typically, if I know that I have a

21   sensitive issue to discuss with a teacher, perhaps because I

22   had been a teacher for so long I recognize that it is that

23   teacher's right to have union representation present and is

24   only fair, and because I believe in the importance of that

25   fairness in the role of the union representative, that my

1 process typically has been if I am going to speak to a

2 teacher, I will inform the union president who will either

3 herself be present or will assign another union

4 representative to support the teacher.

5     Q     Okay.  And so you and Mr. Puglisi and this union

6 representative met on January the 9th?

7     A     That is correct.

8     Q     And what was the purpose for your meeting with

9 Mr. Puglisi?

10     A     The purpose of the meeting was to address the issue

11 of his driving the student to school in the morning and to

12 ask him to stop.

13     Q     Okay.  Let's talk a little bit about the meeting,

14 Friday, January 9.  Mr. Puglisi was present with you I take

15 it?

16     A     That is correct.

17     Q     And perhaps maybe even a little bit easier, Miss

18 Arbes, I've got marked as Government Exhibit 10 and Miss

19 Arbes I'm going to show you Exhibit 10 and ask if you can

20 take a look at that two-page document, and tell me if you

21 recognize what that is?

22     A     Yes, it is a letter of corrective action or

23 corrective admonition in which I address the ride to school

24 as well as the -- his ride home from a basketball game and as

25 well as Hillary being given permission to work in his room

1    during her study halls.

2        Q    That document, that letter, was that something that

3    you drafted?

4        A    This was drafted after our Friday meeting to -- to

5    represent -- to be an artifact documenting that the meeting

6    did indeed occur and this was the information presented.

7        Q    Okay.  And was a copy of that letter at some point

8    either given or sent to Mr. Puglisi?

9        A    Yes.

10       Q    And does that letter memorialize the substance and

11   the information exchanged between you and Mr. Puglisi at that

12   meeting?

13       A    That is correct.

14            MR. LOVRIC:  I would offer Government's

15   Exhibit 10 into evidence.

16            MR. ACCARDI:  No objection.

17            THE COURT:  Receive Government's Exhibit 10 in

18   evidence.

19       Q    Miss Arbes, maybe the easiest thing if you could

20   start from the top and just read the exhibit, Exhibit 10 for

21   us?

22       A    On January 9, 2009 you were involved in a

23   conference with me, your high school principal, and Jill

24   Keeler, Newark Valley United Teacher's President.  The

25   conference was in reference to a report made by other staff

1   members.  The following concerns were addressed:  A student

2   was being granted privileges to work at your classroom

3   computer while your global history class was in session.

4   This student was on the freeze list.  It was confirmed by our

5   instructional technology staff that the student was logged in

6   under your identification.

7          Bullet two, you gave this student a ride home from

8   a basketball game.

9          Bullet three, you were also seen giving this

10  student a ride to school on January 8.

11         At the time of our meeting you admitted that you

12  allowed the student to work at your computer station and help

13  your students with a project.  You also admitted that you

14  transported the student home from a basketball game.  You

15  also stated that the student lives on your route to school

16  and on one occasion you gave her a ride to school.

17         As a result of these admonitions and our

18  observations you are directed not to allow the student to

19  assist in your classroom or to allow the student to use your

20  classroom computer, not to provide rides for the student, to

21  refrain from all out-of-school communications with this

22  student, included but not limited to, telephone

23  conversations, text messages, e-mails, face-to-face meetings.

24  As an additional intervention, your schedule will be adjusted

25  to reflect a study hall duty during the sixth period.  You

1   have further been advised to refrain from any action that

2   will put yourself and the district at risk.  This material

3   will be placed in your personnel file.  Should such behavior

4   occur in the future you may be subject to discipline up to

5   and including termination.  You have certain rights, please

6   refer to your contract for an explanation of these rights.

7       Q    Now, Miss Arbes, although it does not mention the

8   name of the student, the things in there relating to the

9   student, to what student are we referring to that you're

10  talking about?

11      A    Hillary Pratt.

12      Q    And there's an indication in that memo of the

13  student being on a freeze list.  What is that generally

14  speaking?

15      A    Students who are on freeze lists are either in

16  jeopardy of failing a course or have incompletes and are

17  asked -- they're directed to stay in study hall so that their

18  focus can be on the completion of the responsibilities that

19  they owe to whatever teacher.

20      Q    Okay.  And was this something that Hillary had an

21  issue with, a particular class or subject?

22      A    Yes.  Which class I can't -- I can't be certain.

23      Q    Okay.  And the mention in that letter about Hillary

24  using Mr. Puglisi's -- I forget what the word was that you

25  put -- but his account to access the school computer?

1      A      Correct.

2      Q      I take it that in and of itself is not permissible?

3      A      That is not permissible.

4      Q      Now, at that meeting on January 9, when you had

5   this person-to-person conversation with Mr. Puglisi, did he

6   acknowledge -- and I think you read some of the things -- did

7   he acknowledge the things that you raised as to him having

8   done as far as the rides and allowing Hillary to be in his

9   class and so on?

10     A      He did acknowledge them, yes.

11     Q      Okay.  And did you and he, to your understanding,

12  understand what it was that you were directing him to do or

13  not to do?

14     A      I believe that it was clear to Mr. Puglisi, yes.

15     Q      Okay.  Such that when the meeting ended, did he

16  appear to have any kind of questions or question mark in his

17  head as to what he was being directed not to do?

18     A      There was no question.

19     Q      During the meeting, how would you describe his

20  demeanor?

21     A      Very nervous, very emotional, reflective.

22  Acknowledged that his job, his family, all of these things

23  were very important to him and that it was naive of him to

24  think that his kind -- or kind actions towards this student

25  might not have been misperceived.

1        Q     Did he at any point during that meeting on

2   January 9, did he at any point volunteer or disclose any

3   either acts or activities or communications that he was

4   having with Hillary Pratt?

5        A     No.

6        Q     And I take it other than what you documented in

7   that letter, you and the school were not aware if there was

8   anything else, at that time you were not aware of it?

9        A     That is correct.

10              MR. LOVRIC:  That's all I have at this time,

11   Judge.

12              THE COURT:  Okay.  Mr. Accardi.

13              MR. ACCARDI:  One moment, your Honor.

14   CROSS-EXAMINATION

15   BY MR. ACCARDI:

16        Q     Miss Arbes, John was a social studies, global

17   studies teacher, is that what you said?

18        A     That is correct.

19        Q     What's the CT program?

20        A     The CT program is a consultant teacher program.

21   It's a push-in program where another teacher is -- typically

22   a special ed teacher, teacher's partner with Mr. Puglisi.  He

23   had two periods a day with a CT teacher.

24        Q     So what would the difference be between the

25   students and that class, if any?

1    A    Typically, they should -- it should be a

2  heterogeneously grouped classroom of general education

3  students and special education students.

4    Q    And does every teacher have some CT students or you

5  try and assign them to a specific teacher?

6    A    All teachers have students that either have 504s or

7  IEPs.  There might be an increased population of them in the

8  programs such as Mr. Puglisi had with the CT.

9    Q    One of the abbreviations you used --

10    A    Co-teaching or consultant teacher model.

11    Q    And is there a separate principal for discipline at

12  your school for student discipline?

13    A    There is Mr. Warren Harold who is my assistant

14  principal who basically is the front line for discipline

15  issues.  When it escalates to the point of either a

16  superintendent's hearing or something of greater concern,

17  Mr. Harold and I often times partner on those issues.

18    Q    So, is it true that you would not necessarily hear

19  about all the discipline issues with an individual student?

20    A    There might be some that I may not hear about.  An

21  occasional cigarette on the highway or curse here or there.

22  I may not be aware of those, correct.

23    Q    And Hillary Pratt is an honor student to your

24  knowledge?

25    A    She's a good student.  I'm not sure that she is an

1    honor student, but she's a strong student.

2          Q    Ok.  And she's scheduled to graduate this summer?

3          A    That is correct.

4          Q    You aware if she's planning on attending college in

5    the fall?

6          A    I'm not aware of her plans.

7          Q    You haven't talked to her at all about her academic

8    plans?

9          A    I have not.

10         Q    And would somebody in that position have to have

11   been accelerated previously?  In other words, you can't go

12   from eleventh grade to summer school and graduate.  Would you

13   have some credits towards your twelfth year prior to summer?

14         A    A student needs 22 credits to graduate from high

15   school.  It's not unusual if a student has continued to

16   accrue the appropriate number of credits in their ninth,

17   tenth and eleventh grade year.  The reality is it may be only

18   English, participation in government economics that a senior

19   might need.

20         Q    But you indicated she is scheduled to graduate this

21   summer?

22         A    That's correct.

23         Q    Now, could someone be on a freeze list also because

24   they had lost an honor's pass?

25         A    That's sort of synonomous.  Loss of an honor's pass

1    would also suggest that the student is either failing or

2    incomplete in a subject.

3        Q    Could it also be for some disciplinary issue no

4    matter how minor?

5        A    It might be.  It might be.

6        Q    All right.  So, you don't know specifically why she

7    was on the freeze list, do you?

8        A    That is correct.

9        Q    The date of the letter that you referred to, the

10   memo, is that January 20?

11       A    The letter says January 9.

12       Q    Doesn't it say January 20?

13       A    Excuse me.  I'm sorry.  1/20.

14       Q    Is January 20 the date that letter would have been

15   prepared?

16       A    It would have been the date of the letter that it

17   would have been copied by my secretary and given to

18   Mr. Puglisi.

19       Q    So, Mr. Puglisi would not have received it on

20   January 9?

21       A    He would have not.

22       Q    He would have received it no earlier than

23   January 20?

24       A    In this case, yes.

25       Q    And the items that were added on as a result of

1  these admissions, in other words he talked to you about that

2  he did give Miss Pratt a ride home from a basketball game;

3  that he did allow her to use his computer and that he had

4  also given her a ride to school.  Those were all things he

5  admitted to you?

6       A    He admitted those things at our meeting on the 9th.

7       Q    And then based on that, you added on as a result to

8  try and -- what was the phrase -- about in order to protect

9  him and the school you were making further suggestions?

10      A    I'm sorry.  Are you referring to the second of the

11 last paragraph?

12      Q    Well, the second part, as a result of these

13 admissions and our observations you are directed and then you

14 have additional, not to allow the student to assist in your

15 classroom, not to provide rides, and to refrain from all

16 out-of-school communications?

17      A    That is correct.

18      Q    Is that the first time that was raised in the

19 letter or did you talk about that as well in the meeting

20 about out-of-school communications?

21      A    The communications -- all three of those bullets

22 were discussed at our meeting.

23      Q    And did you make any notes of this meeting?

24      A    Absolutely.

25      Q    Do you have those notes with you?

1      A      I do not.

2      Q      Is it common for the school to tell teachers what

3   they can do outside of the classroom?

4      A      I really can't answer that.

5      Q      And also as a result of your discussion you had

6   changed his lunch period?

7      A      His lunch duty, correct.

8      Q      Lunch duty to a study hall?

9      A      Correct.

10      Q      What would the lunch duty normally consist of for

11   him or at least as he was monitoring lunch at that time?

12      A      Lunch duty consists of walking through the

13   cafeteria, watching the cafeteria line to make sure students

14   are not budging in.  Making sure that in-cafeteria students

15   are picking up after themselves.  Making sure the students

16   are well behaved.  Signing passes so that students can go to

17   visit other teachers for extra help or go to the library.

18      Q      And would you say a given lunch period maybe about

19   150 students, does that sound about right?

20      A      That sounds about right, yes.

21      Q      And normally how many teachers would be assigned to

22   that duty at any given lunch period?

23      A      Typically we assign two teachers.

24      Q      And sixth period would have been a lunch period

25   prior to at least this letter Mr. Puglisi was monitoring?

1     A     That's correct.

2     Q     And is it something where students may talk to the

3 teachers, teachers may circulate and talk to the different

4 students during lunch?

5     A     That's correct.

6     Q     And when you discussed Mr. Puglisi and Miss Pratt

7 using the computer, did he explain to you that there was a

8 project that she was working with other people in his class

9 on?

10     A     He explained to me that she was not one of his

11 students.  That she had never been one of his students and

12 that she was working on an essay of her own at that time but

13 yes, that sometimes she did work with her students -- with

14 his students in that class.

15     Q     And his class were basically freshmen and

16 sophomores?

17     A     That is correct.

18                 MR. ACCARDI:  Just a moment, your Honor.

19                 THE COURT:  Sure.

20                 MR. ACCARDI:  Thank you, Miss Arbes.

21                 THE COURT:  Anything further, Mr. Lovric?

22                 MR. LOVRIC:  Just a couple questions.

23 REDIRECT EXAMINATION

24 BY MR. LOVRIC:

25     Q     The letter that was sent to Mr. Puglisi you read

1   and it had certain directives of what he should or should not

2   do.  Were those directives orally communicated to him at that

3   meeting on January 9?

4        A    Yes, they were.

5        Q    Okay.  So, there was nothing in this letter that

6   you put in writing, memorialized, that you did not say to

7   him, Mr. Puglisi, personally on January 9?

8        A    That is correct.

9             MR. LOVRIC:  Okay.  That's all.

10  RECROSS-EXAMINATION

11  BY MR. ACCARDI:

12       Q    Miss Arbes, did you have any information that he

13  was texting Hillary?

14       A    I did not but upon the advice of our attorney, his

15  advice in reviewing the letter was to include that language

16  as well.

17       Q    So did you talk about it with Mr. Puglisi before

18  talking to the attorney?

19       A    We did not discuss specifically the method used for

20  communication, no.  Communication was, yes.

21       Q    All right.  So you did not in your meeting with

22  Mr. Puglisi specifically say don't text her?

23       A    That is correct.

24       Q    Because I was under the impression from your

25  response to the government's attorney that all the things

1  that you put in your letter were specifically discussed with

2  Mr. Puglisi and I understand that's not, in fact, so?

3      A    The general reference to no communication was made.

4  The specific listing or enumeration was not.

5      Q    Okay.

6              MR. ACCARDI:  Thank you.

7              THE COURT:  Anything further?

8  REDIRECT EXAMINATION

9  BY MR. LOVRIC:

10     Q    Miss Arbes, I don't want to mix words.  Was it

11  clearly communicated to Mr. Puglisi on January 9 that he was

12  to have no contact, whether physical, extraterrestrial of any

13  kind with Hillary Pratt?

14     A    Yes, it was clear.

15             MR. LOVRIC:  Okay.  That's all.

16             MR. ACCARDI:  I don't want to belabor the

17  point.  You actually told him no extraterrestrial contact?

18             THE WITNESS:  No.

19             MR. ACCARDI:  Thank you.

20             THE COURT:  All right.  You may step down,

21  ma'am.  Thank you.

22             (Witness excused).

23

24

25

1                    C E R T I F I C A T I O N

2

3

4              I, VICKY A. THELEMAN, RPR, CRR, United

5    States Court Reporter in and for the United States

6    District Court, Northern District of New York, do

7    hereby certify that I attended at the time and place

8    set forth in the heading hereof; that I did make a

9    stenographic record of the proceedings had in this

10   matter and cause the same to be transcribed; that

11   the foregoing is a true and correct copy of the same

12   and the whole thereof.

13

14

15                              _____

16                              VICKY A. THELEMAN, RPR, CRR

17                              United States Court Reporter

18                              US District Court - NDNY

19

20

21   Dated:  September 23, 2009.

22

23

24

25