IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK
*****************************************

UNITED STATES OF AMERICA,

                                                Criminal Action No.

        v.                                         3:09-CR-75

JOHN PUGLISI,

                            Defendant.
*****************************************

## SENTENCING MEMORANDUM OF THE UNITED STATES

**I.**      **INTRODUCTION**

On February 12, 2009, a federal grand jury handed up Indictment 3:09-CR-75 charging defendant Puglisi with three separate offenses. Defendant was indicted as follows:

    1) Attempted Production & Production Of Child Pornography, 18 USC 2251(a) (Count 1);

    2) Attempted Persuasion/Enticement & Persuasion/Enticement Of A Minor, 18 USC 2422(b) (Count 2);

    3) Attempted Possession/Access To View & Possession/Access To View of Child Pornography 18 USC 2252A(a)(5)(B) (Count 3).

Defendant Puglisi proceeded to trial before this Court. A jury trial commenced on July 20, 2009 with jury selection and the jury rendered its verdict on July 24, 2009. The jury convicted Puglisi on all Counts 1-3. The United States submits this Memorandum in anticipation of sentencing.

This Memorandum addresses the Presentence Investigation Report (PSR). We have not received defendant's sentencing memorandum. We reserve the right to file a supplemental sentencing memorandum to respond to defendant's memorandum. If the Court is considering a departure from the applicable Sentencing Guidelines range on a ground not previously identified by

the parties or in the Presentence Investigation Report, the parties are entitled to notice and an opportunity to respond. *See* Fed R. Crim. P. 32(i)(1)(c), 32 (h).

## II. PLEA AGREEMENT

There is no plea agreement in this case. Defendant Puglisi put the government to its burden of proving his guilt beyond a reasonable doubt before a jury.

## III. PRESENTENCE REPORT

### A. Factual Findings

The United States adopts the facts in the Presentence Investigation Report (PSR). Additionally, having presided over this trial, this Court is familiar with all the facts, evidence and exhibits introduced into evidence at trial. In addition to the facts and information contained in the PSR, the government also relies upon all the facts, evidence and information introduced at the trial. We also herein incorporate **Exhibits 1, 2, 3, & 4** which were previously filed with this Court under seal with the government's Rule 29 memorandum. Those exhibits are the trial transcripts of the trial testimony of government's witnesses FBI agent Lyons, Diane Arbes (principal of Newark Valley High School), Susan Schwenk (Victim's mother), and the Victim. In order to protect the identity of the Victim, exhibits 1-4 were filed under seal. All the trial exhibits are available for the Court's review upon request.

### B. Calculation of the Sentencing Guidelines Range

The United States adopts the Sentencing Guidelines calculations in the Presentence Investigation Report. As set forth in the PSR, Puglisi's Total Offense Level is a 40 and his Criminal History Category is a I. Therefore, the applicable sentencing guidelines range is 292-365 months

imprisonment. The PSR correctly scores defendant's guidelines enhancements. We agree with the PSR scoring and the application of the enhancements.

The PSR correctly scores and applies a 2 level enhancement for Obstruction Of Justice. As the evidence at trial demonstrated by way of testimony from the Victim, Investigator Mulvey, and FBI agent Lyons, in addition to the reading of the text messages of January 23, 2009, defendant Puglisi engaged in obstruction of justice after learning that the police were investigating his conduct. On the morning of January 23, 2009, Kristin Puglisi, defendant's wife, became aware that the New York State Police was investigating defendant's conduct relating to the Victim. Kristin Puglisi texted and called defendant at school that morning to advise him that the police were aware of his conduct as to the victim and that they had spoken to Kristin Puglisi. Immediately after receiving this information from Kristin Puglisi, defendant texted the Victim and directed her to come and meet him in the hallway of the school immediately. Puglisi then advised the Victim that the police knew about their activities and were investigating. Shortly thereafter Puglisi got word to the Victim directing her to bring the verizon cell phone to his classroom and place it on his desk. The Victim complied and placed the cell phone on defendant's desk as defendant stood nearby in the classroom. That cell phone was the phone that defendant purchased for the Victim and with which she took sexually explicit photographs of herself and sent to defendant. Defendant then discarded/destroyed or secreted that cell phone. The police arrived shortly thereafter at the school and arrested defendant. A search of the school failed to locate that cell phone which defendant had retrieved from the Victim. The cell phone itself was evidence of the commission of the crimes. By directing the victim to hand over "evidence" (the cell phone) to him which defendant then either discarded or secreted is obstruction of justice. Furthermore, evidence such as photographs were either destroyed or

3

discarded by defendant after learning that the police were investigating his activities. By his actions and by retrieving the cell phone from the Victim, defendant made certain that any photographs of the Victim on that cell phone would not be recovered by the police. Finally, defendant also deleted everything from his own cell phone including photographs and texts.

The PSR also correctly scores and applies a 2 level enhancement because the commission of the offenses involved the use of a computer and use of an interactive computer service. At times during communications with defendant, the Victim utilized a computer and also utilized America On Line (AOL), a computer interactive service, in order to communicate with defendant Puglisi by way of instant messaging. These communications, by way of computer and interactive computer service, were a part of and pursuant to defendant's continuing contact with the Victim and continuing sexual activities with the Victim. Utilization of a computer and interactive computer service by the Victim to communicate with defendant, warrants application of this guidelines enhancement. Further justification for application of this enhancement is based upon the fact that the Victim informed investigators that defendant used a computer on occasion to send her e-mails. Additionally, defendant used his computer at school in order to send to Susan Schwenk the "Seth" e-mail. When the Victim's mother learned that defendant, a school teacher, was inappropriately communicating with her daughter, defendant utilized his computer on January 8, 2009 at school to send the mother an e-mail wherein defendant perpetuated the fictitious "Seth" story in order to deceive the mother and to continue communicating with the Victim. See trial exhibit 11, the computer e-mail that defendant sent in his capacity as a high school teacher to Susan Schwenk, Victim's mother, whereby defendant perpetuated the fabricated story about how "Seth", a non-

4

existent teenage boy, was the one communicating with the Victim (defendant sent this e-mail from his school computer).

The PSR also correctly scores and applies a 2 level enhancement given that the victim was in the supervisory control of the defendant. Defendant Puglisi was a high school teacher at Newark Valley High School. The Victim was a 16 year old student at that school. Defendant was entrusted by parents, the school, and the community to care for all the high school kids that attended Newark Valley High School. As one of the teachers and educators at the high school, defendant possessed considerable authority and power in the high school community and among the student population in general. This enhancement clearly applies in this case. Defendant had access to the Victim solely based upon his position at the school. He exercised supervisory control and influence over the victim by his position within the school. Defendant texted the Victim on numerous occasions while the Victim and defendant were both on school grounds and school was in session. Defendant drove the Victim to school on numerous occasions. Defendant provided the Victim with gifts of lunches and cigarettes which he provided to the Victim on school grounds.

## IV. GOVERNMENT'S SENTENCING RECOMMENDATIONS

The government recommends that this Court sentence defendant Puglisi to a sentence within the applicable sentencing guidelines range as calculated in the PSR on each of the three counts to run concurrently to each other. We also recommend that the Court impose a Life term of supervised release on each count to run concurrently to each other.

Defendant Puglisi was a high school teacher at Newark Valley High School. He was suppose to be an educator and mentor for young teenage kids. He was suppose to be a role model. He was entrusted by parents, the school, and the community to care for all the high school kids that

attended Newark Valley High School. He was suppose to guide those kids both morally and academically. As one of the teachers and educators at the high school, defendant possessed considerable authority and power in the high school community and among the student population in general. Puglisi was a person that society and the educational system relied upon to shield, protect, and keep safe the kids who attended Newark Valley High School. Puglisi was one of the people that the school, parents, and community relied upon to keep safe kids like the Victim from becoming victimized by sexual predators. Instead, Puglisi turned out to be the sexual predator who preyed on a kid at the school. Puglisi took advantage of a high school kid who had a crush on him. He used that kid in every sense of the word. Instead of protecting the Victim, Puglisi abused his position as a teacher and abused a high school kid. And he now stands before this Court and wants this Court to conclude that this entire scenario was simply a Romeo and Juliette love story. Principal Diane Arbes said it best when she said that teachers are held to a higher standard and the job of a teacher is "sacred".

## V. PROCEDURAL AND FACTUAL BACKGROUND

Defendant Puglisi proceeded to trial before this Court. A jury trial commenced on July 20, 2009 with jury selection and the jury rendered its verdict on July 24, 2009. The jury convicted Puglisi on all Counts 1-3.

At trial, the government called 6 witnesses in its case-in-chief. Additionally, 29 government Trial Exhibits were received into evidence and published to the jury.[1] Defendant Puglisi called no

---

[1] Trial Exhibits received into evidence and published to the jury included the following: Trial Exhibits 4 & 5, AT&T telephone records demonstrating that defendant and the Victim communicated by telephone texting and calling approximately 3000 times between 12/5/08-1/5/09; Trial Exhibit 6, the two Trac Phones that defendant purchased for and gave to the Victim in order to communicate with the Victim after the Victim's mother took away her AT&T telephone; Trial

witnesses. The government called the following witnesses on its direct case: Christopher Greer (Verizon Wireless representative); Susan Mulvey (Senior Investigator New York State Police); Diane Arbes (principal of Newark Valley High School); James T. Lyons, Jr. (FBI Special Agent); Susan Schwenk (Victim's mother); and the Victim.[2]

Defendant John Puglisi was a high school teacher at Newark Valley High School in Tioga County, New York. See, Exhibit 2 Arbes' testimony. He worked at the high school as a teacher for several years prior to his arrest on January 23, 2009. Exhibit 2 Arbes' testimony. The Victim in this case was a sixteen (16) year old high school teenager who attended Newark Valley High School (hereinafter Victim). See, Exhibit 4 Victim's testimony.

Commencing in December of 2008 and continuing through January 23, 2009, defendant Puglisi communicated with the Victim using cellular telephones. The Victim at times used a

---

Exhibit 11, the computer e-mail that defendant sent in his capacity as a high school teacher to Susan Schwenk, Victim's mother, whereby defendant perpetuated the fabricated story about how "Seth", a non-existent teenage boy, was the one communicating with the Victim (defendant sent this e-mail from his school computer); Trial Exhibits 15, 17-22, Verizon telephone records demonstrating that defendant and the Victim communicated by telephone texting approximately 1900 times between 1/9/09-1/23/09; Trial Exhibit 3, Verizon Pix Records demonstrating that the Victim sent to defendant via text messaging approximately 50 photo images between 1/17/09-1/23/09; Trial Exhibits 2, 23-32, graphic and explicit text messages exchanged between defendant and the Victim between 1/14/09-1/23/09 wherein defendant expressly told and described to the Victim the type of sexual acts he wished to perform upon her; that defendant wanted sex from the Victim; defendant repeatedly asked the Victim to take naked pictures of herself and send to him via telephone; defendant sexually gratified himself while texting, viewing, and commenting about the photo images sent by the Victim to defendant's telephone and defendant requested that she send more photos and more explicit photos of herself. [All the Trial Exhibits introduced by the government are incorporated herein and are available for the Court's review].

[2] Incorporated herein are **Exhibits 1, 2, 3, & 4**, the trial transcripts of the trial testimony of government's witnesses FBI agent Lyons, Diane Arbes, Susan Schwenk, and the Victim. Those exhibits were previously provided to the Court and filed under seal in order to protect the identity of the Victim.

7

computer to communicate with defendant. See, Exhibit 4 Victim's testimony. Between December of 2008 and January 23, 2009, defendant Puglisi and the Victim exchanged several thousand text messages between defendant's cellular telephone and the Victim's cellular telephones. See, Trial Exhibits 2, 4, 5, 15, 17-32 and Exhibit 1 Lyons testimony pages 1-14. Many of the text messages contained explicit sexual messages whereby defendant Puglisi and the Victim discussed sexual activities; sexual conduct; planning to engage in sexual activities; discussions about meeting to engage in sexual activities; and discussions about ways to keep their sexual relationship secret. See, Trial Exhibits 2, 23-32 (text content Verizon records), Exhibit 1 Lyons testimony pages 18-74. Puglisi used cellular telephone texting to attempt to and to persuade, induce and entice the Victim to engage in and to continue to engage in sexual conduct with him. See, Exhibit 1 Lyons testimony pages 18-74 and Trial Exhibits 2, 23-32. In numerous text messages, defendant Puglisi also encouraged, requested, and practically pleaded that the Victim take sexually explicit photographs of herself with the cellular telephone camera that he had purchased for her and to send those images to defendant's cellular telephone. See, Exhibit 1 Lyons testimony pages 31-74, Trial Exhibits 2, 26-32 (text content). Defendant Puglisi had purchased and given the Victim two Trac cell phones and a Verizon camera cell phone for the express purpose of communicating with the Victim between 1/9/09-1/23/09.[3] See, Exhibit 4 Victim's testimony pages 29-89, Exhibit 1 Lyons testimony pages 1-74. The Victim did use the Verizon cellular telephone camera to take numerous photographs of

---

[3] It is worth noting that as of January 9, 2009, the Victim's mother and school officials had become aware that defendant was communicating with the Victim. Defendant lied to the mother by perpetuating the "Seth" story in an e-mail that he sent the mother from his computer at school. Defendant dismissed the school principal's directive to have no further contact or communications with the Victim. Defendant thereafter chose to purchase a total of three cell phones and gave them to the Victim so that defendant could continue to secretly communicate with the Victim and to continue his sexual relationship with the Victim.

8

herself in sexual poses while partially unclothed. See Exhibit 1 Lyons testimony pages 31-74 (reading of explicit text messages where defendant commented on the sexual nature of the images sent by the Victim and defendant requested naked images from the Victim), Trial Exhibits 2, 23-32 (text messages content where defendant requested naked photo images from the Victim and commented on how sexual in nature the images were that the Victim did send to defendant). The Victim sent the images of herself to defendant Puglisi's cellular telephone via texting. Defendant Puglisi received the images of the Victim in sexual poses and saved the images to his cellular telephone where he viewed them and usually commented about them; re-viewed them later; requested that the Victim send him more images; and commented in text messages about the sexual nature of the images. See Exhibit 1 Lyons testimony pages 31-74, Trial Exhibits 2, 23-32, and Trial Exhibit 3.

The texting content and the Verizon records painted a clear picture of how defendant requested, begged and pleaded for the Victim to take naked pictures of herself and send to defendant; to touch herself in a sexual way when taking the pictures; and to keep sending to defendant sexual photographs. See, Exhibit 1 Lyons testimony pages 31-62. At defendant's request and on numerous occasions, the Victim, using the Verizon cellular telephone with camera which was purchased by defendant, photographed herself in sexually explicit poses and stages of undress. The Victim sent the images to defendant's cellular telephone. Defendant specifically texted the Victim commenting on how sexual the images were and pleading for the victim to send naked pictures of herself to defendant. See, Exhibit 1 Lyons testimony pages 31-62. In his texts, defendant bragged to the Victim how he was viewing her photographs on his cellular telephone over and over again. Exhibit 1 Lyons testimony pages 31-62.

9

Puglisi showered the Victim with constant attention and constant communication via texting and telephone communications. He texted her first thing in the morning; while she was in school; throughout the evening; and many times into the early morning hours. Puglisi also showered the Victim with money; "prizes"-----prizes she would receive if she came over to his apartment where they engaged in sexual acts; cigarettes-----where defendant even went out during school hours to purchase the Victim cigarettes and deliver them to her in school; taking the Victim out shopping and dining; making her school lunches and delivering them to her in school; giving her rides to school; and providing the Victim with free cellular telephones. See, Exhibit 4 Victim's testimony, Exhibit 1 Lyons testimony, Trial Exhibits 2, 23-32.

Between December of 2008 and January 23, 2009 and while defendant Puglisi and the Victim communicated via texting and the sending of images of the Victim to defendant, defendant Puglisi engaged in sexual intercourse with the Victim on several occasions. Defendant Puglisi brought the Victim to his apartment in Endicott, New York where he engaged in sexual intercourse with the Victim on a number of occasions. See, Exhibit 4 Victim's testimony, Exhibit 1 Lyons testimony pages 31-74, Trial Exhibits 2, 23-32, and Trial Exhibit 3.

When the Victim's mother learned that defendant, a school teacher, was inappropriately communicating with her daughter, defendant utilized his computer on January 8, 2009 at school to send the mother an e-mail wherein defendant perpetuated the fictitious "Seth" story in order to deceive the mother and to continue communicating with the Victim. See Exhibit 11, the computer e-mail that defendant sent in his capacity as a high school teacher to Susan Schwenk, Victim's mother, whereby defendant perpetuated the fabricated story about how "Seth", a non-existent

teenage boy, was the one communicating with the Victim (defendant sent this e-mail from his school computer). See also Exhibits 3 & 4 trial transcripts of Schwenk and Victim.

On January 9, 2009, Diane Arbes, the high school principal, met with defendant and directed him to have no further contact whatsoever with the Victim in school or out of school. See Exhibit 2, Arbes trial testimony.

Defendant responded by purchasing the Victim two Trac cell phones and a verizon cell phone in order to continue secretly communicating with the Victim. Defendant continued to take the Victim to his apartment and engage in sexual intercourse with her.

On the morning of January 23, 2009, Kristin Puglisi, defendant's wife, learned of the ongoing police investigation of defendant. Kristin Puglisi tipped off defendant that same morning. Defendant immediately directed the Victim to surrender her verizon cell phone to him at school (the verizon camera cell phone that he purchased for her and which she used to take sexually explicit images and send to defendant). Defendant took custody of that verizon cell phone and discarded/destroyed it or secreted it. When police arrived at the school shortly thereafter and arrested defendant, that verizon cell telephone was nowhere to be found. See, Exhibit 4 Victim's testimony, Exhibit 1 Lyons testimony, Trial Exhibits 2, 23-32.

## VI. GOVERNMENT'S RECOMMENDATION WITHIN GUIDELINES RANGE

The government respectfully contends that a sentence as recommended above within the Guidelines range as calculated in the PSR would be "sufficient, but not greater than necessary," to comply with the sentencing purposes in 18 U.S.C. § 3553(a)(2).

"[I]n the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough v.*

*United States*, __ U.S. __, 128 S. Ct. 558, 574 (2007); *see*, *e.g.*, *Gall v. United States*, __ U.S. __, 128 S. Ct. 586, 594 (2007) (Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions"); *United States v. Rattoballi*, 452 F.3d 127, 133 (2d Cir. 2006) (Guidelines were fashioned after careful consideration of the other § 3553(a) factors by "an expert agency whose statutory charge mirrors the § 3553(a) factors"). Moreover, within-Guidelines sentences promote Congress's goal in enacting the Sentencing Reform Act -- "to diminish unwarranted sentencing disparity." *Rita v. United States*, 551 U.S. 338, 127 S. Ct. 2456, 2467 (2007).

The government objects to the imposition of a sentence below the Guidelines range as calculated in the Presentence Investigation Report (PSR). The record reveals no mitigating factors not adequately considered by the Sentencing Commission that would remove this case from the "mine-run" of similar cases, *see Rita*, 127 S. Ct. at 2465.

## VII. PROCEDURAL REQUIREMENTS

### A. Consideration of the Sentencing Guidelines and the § 3553(a) Factors

The Court "should begin all sentencing proceedings by correctly calculating the applicable guidelines range." *Gall*, 128 S. Ct. at 596 (2007); *see United States v. Cavera*, 550 F.3d 180, 190 (2d Cir. 2008) (citing a failure to calculate the Guidelines range or an incorrect calculation of the Guidelines range as examples of procedural error). In addition, in determining the sentence, the Court must consider the sentencing factors in § 3553(a). *Cavera*, 550 F.3d at 188-89.

If the Court decides to impose a non-Guidelines sentence, the Court "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 128 S. Ct. at 597. "[A] major departure should be supported by a

more significant justification than a minor one." *Id*. Although a sentencing court may vary from a Guideline range based on a policy disagreement with the Guidelines, such a deviation may not be entitled to the same deference as a fact-based deviation.

> [A] decision to vary from the advisory Guidelines may attract greatest respect when the sentencing judge finds a particular case "outside the 'heartland' to which the Commission intends individual Guidelines to apply.". . . On the other hand, while the Guidelines are no longer binding, closer review may be in order when the sentencing judge varies from the Guidelines based solely on the judge's view that the Guidelines range "fails to properly reflect § 3553(a) considerations" even in a mine-run case.

*Kimbrough*, 128 S. Ct. at 574-75 (citations omitted); *see Cavera*, 550 F.3d at 192.

### B. Resolution of Material Issues of Fact

Prior to sentencing, the Court must resolve any material issues of fact, and must state its factual findings – by adoption of the Presentence Report or otherwise – on the record in a manner sufficient to permit appellate review. *See, e.g., United States v. Phillips, 431 F.3d 86, 93-94* (2d Cir. 2005). The Court is authorized to make all factual determinations relating to the Sentencing Guidelines by a preponderance of the evidence, considering any reliable evidence, including hearsay. *See United States v. Gonzalez*, 407 F.3d 118, 125 (2d Cir. 2005); *United States v. Martinez*, 413 F.3d 239, 243 (2d Cir. 2005).

### C. Statement of Reasons for the Sentence

Section 3553(c) requires the Court, "at the time of sentencing," to "state in open court the reasons for its imposition of the particular sentence." Although a Guidelines sentence "will not necessarily require a lengthy explanation," where a party presents non-frivolous reasons for a non-Guidelines sentence "the judge will normally go further and explain why he has rejected those arguments." *Rita*, 127 S. Ct. at 2468. If the Court decides to impose a non-Guidelines sentence it must state "the specific reason" for imposing a sentence other than a Guidelines sentence, and the

13

"reasons must also be stated with specificity" in the written judgment. 18 U.S.C. § 3553(c)(2); *Cavera*, 550 F.3d at 193; *United States v. Goffi*, 446 F.3d 319, 321-22 (2d Cir. 2006).

## VIII. CONCLUSION

We recommend that the Court sentence defendant Puglisi to a term of imprisonment within the applicable sentencing guidelines range as calculated in the PSR on each of the three counts to run concurrently to each other. We also recommend that the Court impose a Life term of supervised release on each count to run concurrently to each other.

Dated: May 12, 2010                              Respectfully submitted,

                                                RICHARD S. HARTUNIAN
                                                United States Attorney

                                                      /S/

                                                By: Miroslav Lovric
                                                Assistant U. S. Attorney

## CERTIFICATE OF SERVICE FOR ELECTRONIC CASE FILING SYSTEM

I hereby certify that on May 12, 2010, I electronically filed with the NDNY Clerk of the District Court using the CM/ECF system the above-referenced document(s) in connection with the above-referenced case. The CM/ECF system automatically sent electronic notifications of such filing to the attorneys of record in this case, as maintained by the District Court Clerk's Office, AND who are properly registered in the CM/ECF system for the NDNY as required pursuant to NDNY General Order #22. As for any attorney of record in this case who is not registered in the CM/ECF system for the NDNY, the government has caused to be mailed or faxed to that attorney either the actual CM/ECF electronic notification/e-mail as received from the CM/ECF system by the government and/or the actual documents being filed. Therefore, the non-registered attorney(s) will receive the same electronic ECF notice with the same information as will the attorney(s) who is/are registered in the CM/ECF system.

/S/
Miroslav Lovric
Assistant U.S. Attorney